Everett H. Bickley v. Commissioner.
Everett H. Bickley v. Commissioner
Docket No. 23332.
United States Tax Court
1951 Tax Ct. Memo LEXIS 15; 10 T.C.M. (CCH) 1171; T.C.M. (RIA) 51346; December 17, 1951
*15 Andrew B. Young, Esq., 1222 Real Estate Trust Bldg., Philadelphia 7, Pa., and David P. Brown, Esq., for the petitioner. Kalman Goldring, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves a deficiency in the amount of $16,545.63 in income and victory tax for the calendar year 1943 and negligence penalties in the amounts of $712 and $827.28 for the calendar years 1942 and 1943, respectively. The year 1942 is involved because of the forgiveness feature of section 6 of the Current Tax Payment Act of 1943. The asserted penalty for 1942 is based on the deficiency determined in income tax for 1942 without regard to the cited Act. Certain issues have been settled by stipulation of the parties. The remaining issues present the following questions, with regard to both of the taxable years 1942 and 1943: (1) whether an alleged valid and subsisting business partnership existed between petitioner and his wife; (2) whether an alleged factor of normal obsolescence should result in a greater rate of depreciation than was allowed; and (3) whether the negligence penalties were properly asserted. A portion of the *16 facts have been stipulated. Findings of Fact The stipulated facts are so found. The petitioner, a resident of Norberth, Pennsylvania, filed his individual original and amended income tax returns for 1942 and his individual return for 1943, with the collector of internal revenue at Philadelphia, Pennsylvania. The petitioner, aged 62, is a graduate engineer who has engaged in the practice of his profession in the chemical, mechanical, electronic and optical fields over a long period of years, during which he has been employed by many concerns in various engineering capacities. He has also privately engaged in research and the development of inventions and in connection therewith first adopted the trade name of Bickley Manufacturing Company in 1910. At the time of petitioner's marriage to Mary K. Benedict in September 1913, he had cash assets of approximately $3,000, including proceeds from sale of a patent. At that time, Mary had assets consisting of $9,000 cash and $2,000 par value Argentine bonds, accumulated through savings, inheritance and gifts from her father. Mary had had considerable business experience as an assistant to her father in his wholesale grocery and tobacco *17 business in Port Huron, Michigan. From 1914 to 1918 petitioner and his wife resided in Pittsburgh where he was employed as chief engineer for the H. J. Heinz Co. From 1918 to the present time, except for temporary residence in San Diego, California, during part of 1926-1927, they resided in the Philadelphia area where petitioner rendered services to various employers until 1930. He maintained at home a shop wherein development work on inventions was undertaken. From about the time of their marriage and throughout the succeeding years petitioner and his wife used their assets, knowledge and experience in various joint ventures with the understanding that they would share fifty-fifty in the profits and losses therefrom. From 1918 until 1930 the petitioner and his wife jointly built and sold numerous residential houses as to which petitioner acted as general contractor to the extent that other employment permitted and Mary contributed the interior designing, supervision of construction and initially the financing thereof out of her separate funds. The housing venture, which was terminated in 1930, resulted in substantial profits which were agreed to be shared fifty-fifty but were not *18 actually divided. The proceeds from the sales of the houses were, for the most part, deposited in Mary's separate bank account which was used as a sort of revolving fund in the building venture. The petitioner and his wife also invested, on a fifty-fifty basis, in two oil drilling enterprises, one resulting in a profit and the other a loss. In December 1918 Mary withdrew $2,000 from the funds in her separate Philadelphia bank account which sum was used as the initial deposit in a new account in a Philadelphia bank in the name of Bickley Manufacturing Company, hereinafter referred to as the Company. Thereafter other withdrawals in substantial amounts were made from Mary's account and deposited to the account of the Company, including an aggregate of $11,250 in 1926 and the entire balance in a substantial amount remaining in her account in 1930. From 1918 to 1930 the signature card for the Company account showed the following "Bickley Mfg. Co., Everett H. Bickley, Prop." with a notation referring to a letter dated December 21, 1918 signed by petitioner, stating that the Company "is a partnership owned solely by the undersigned." In February 1931 and on instructions from petitioner, *19 the signature card for the Company's account was changed so that checks thereon could be signed by either petitioner or Mary B. Bickley. From the time Mary closed out her separate account in 1930 until 1942 the account in the name of the Company was the only bank account that either of those parties had. Mary's separate bank account was closed out in 1930 because the joint residential building venture had ended and petitioner and his wife had agreed to put their joint funds and efforts, on a fifty-fifty basis, into the exploitation of a mechanical bean sorting device. From 1915 when petitioner conceived the idea while employed by H. J. Heinz Co., to 1929 petitioner developed and patented a device for sorting beans by means of photo-electric cells and compressed air. The development work had been done, mostly at night, in the basement and garage of the petitioner's home and Mary materially assisted him in the assembly and reassembly work and painting. The first practical sorter was perfected and demonstrated to H. J. Heinz Co. in 1929, following which two experimental and demonstrator sorters were built and used in the Heinz plant, the first one for a two year period and the second *20 one for one year. In or about 1933 four sorters were built and made the subject for the first lease on the machines to the Heinz Co. The development of the experimental sorters cost approximately $30,000 and the four sorters leased to Heinz cost an additional $16,000. In connection therewith the funds in the bank account of the Company, embracing the funds of both petitioner and his wife, were exhausted and petitioner had to borrow $4,000 from Heinz, repayable out of future rentals on the four leased machines. During the period from 1929 to 1940 the sorter machines were built in the basement of petitioner's residence and one first floor room was converted into an office. During that period Mary regularly contributed her services to the enterprise, at first in helping with the actual assembly and later as employees were hired in assisting in supervising their work; answering telephone calls, handling correspondence, keeping accounts and records; ordering materials and shipping parts; signing most of the checks for bills and payrolls; interviewing prospective lessees; participating equally with petitioner in making policy decisions in the business and taking complete charge of the *21 business during petitioner's many absences in connection with installing and servicing of bean sorters. As the business expanded Mary's duties increased and after the opening of the Company's plant in 1940 and throughout the taxable years, Mary continued to render similar services, dividing her time between the office at the plant and the office at home where many of the records were maintained. During the war years Mary was particularly active in running the business because of petitioner's official duties as a member of the National Inventors Council. Petitioner has always paid the expenses of maintaining his household. Prior to 1930 such expenses were paid out of his salary earnings. In 1933 petitioner and Mary expressly modified their earlier agreement of an equal division of profits from the bean sorter enterprise, by agreeing that petitioner was entitled to draw $100 per week from the business. On December 28, 1941, they again expressly modified their agreement to provide that out of the first $9,000 profits from the business per year $6,600 be paid to petitioner and $2,400 be paid to Mary and of even date the latter jotted down a memo to that effect in an office order book. *22 In the spring of 1943 petitioner and Mary signed a written agreement setting forth the above mentioned division of the first $9,000 profits of the business and further stating that any balance of profits be divided equally and that any losses be shared equally. Other than the above mentioned payments to petitioner and Mary, no profits were withdrawn from the Company by either of them until in 1942 each withdrew $8,000 and deposited the same in separate bank accounts. The petitioner and his wife Mary, prior to and during the taxable years, agreed to and did combine substantial amounts of their individual capital together with vital personal services, with a bona fide intent to engage in business as partners under the trade name of Bickley Manufacturing Company. During the taxable years the profits therefrom were distributable pursuant to the agreements of December 28, 1941 and 1943. The bean sorter manufactured by the Company consisted of a metal frame on which were mounted a series of units or sorting heads, each of which contained several delicate, fast moving, electrically operated mechanical parts and electrical optical parts and compressed air ejector parts and for the whole *23 series of units there were feeder hoppers and channels, travelling belts, rollers, gears, etc., and an electric motor. The beans from the hoppers were manipulated by mechanical fingers into single file down a narrow channel where each bean was illuminated by a light and an electric eye looked at it and if the bean was good the eye activated a compressed air jet for ejecting the bean onto a travelling belt to be deposited into a container. In the case of a bad bean the discoloration resulted in the eye not activating the ejector and the bean passed to another travelling belt for discard. The production of mechanical bean sorters soon became a highly competitive field with nearly every year bringing about improvements in methods of operation for greater speed and efficiency in sorting and less trouble in mechanical operation. The progress of development in the art of photoelectric bean sorting was such that the Company experienced seven fundamental changes in the character of its sorters between 1932 and 1943 with the result that, aside from ordinary wear and tear from use, its machines had to be frequently rebuilt and modernized to incorporate improvements. The leases for the Company's *24 bean sorters were for two year periods. Up to and including 1943, the Company's experience was that: about ten leases were terminated in less than two years because of cancellation by the lessees or cancellation for failure of the lessees to pay rentals, or machines burnt out or failed for insufficient maintenance by the lessees; about twelve leases ran for the two year period but were not renewed by the lessee or by the Company for cause; about seven leases ran for three years and two leases ran for slightly more than three years. Machines repossessed on termination of leases could not be leased to new lessees because the latter insisted on new or rebuilt machines incorporating the latest improvements. The rebuilding of a machine required all new parts except for the frame and the latter represented only 20 per cent of the cost of the sorter. The average useful life of the Company's bean sorters to extent of all mechanical and electrical parts (representing 80 per cent of the cost thereof) except the frame, and allowing for normal obsolescence due to competitive technological improvements, was three years. The petitioner's original return for 1942 was prepared by an accountant. *25 The petitioner prepared his amended return for 1942 and his return for 1943, on the basis of such information as he was able to determine for himself from the law and information pamphlets. Further, he used various tabulations prepared from so-called summary sheets compiled by his wife by segregating and recording checks, vouchers and other original data regularly maintained and preserved in connection with the business conducted under the name of Bickley Manufacturing Company. Respondent determined that some portions of the asserted deficiencies for 1942 and 1943 were due to negligence or intentional disregard of rules and regulations. Opinion With reference to the first issue we do not deem it necessary to set out in detail any findings on the tracing of funds of petitioner and his wife, respectively, though various bank accounts in different cities and through numerous transactions as are shown in the record. Suffice it to say that record establishes to our satisfaction that both parties had substantial amounts of individual capital, all of which wound up in the bean sorter business. The rendition of vital services by both parties to that business and earlier joint enterprises *26 is well established. We find nothing in the record to support respondent's position that the relationship between the petitioner and his wife was that of independent contractors in the building business, that of co-investors in the oil venture, and that of creditor and debtor in the bean sorting machine enterprise, or, respondent's further position that other than acting as an employee of petitioner at various times Mary did not more than perform the wifely duties of assisting her husband in his business endeavors. Our finding of fact that petitioner and his wife were engaged in business as bona fide partners during the years in question is dispositive of the first issue. In reaching that conclusion and ultimate finding of fact we have considered the principles laid down in such cases as Commissioner v. Culbertson, 337 U.S. 733; Lusthaus v. Commissioner, 327 U.S. 293; Commissioner v. Tower, 327 U.S. 280, and other similar cases. On this issue we hold that respondent erred in his determination. On the second issue herein there is no controversy as to the cost basis and only the rate of depreciation on the bean sorters is involved. The petitioner's *27 complaint is that in determining the allowance for exhaustion, wear and tear on the Company's machines respondent failed to include "a reasonable allowance for obsolescence" as provided by section 23(1) of the Internal Revenue Code. In our opinion, the uncontradicted evidence establishes a factor of normal obsolescence which when taken into account determines a rate of depreciation computed on the basis of a three year life to the extent of 80 per cent of the cost of the bean sorters, as found in our findings of fact. In determining the three year life we have given greater weight to the period of time that leases remained in effect rather than the cancellations, and terminations of leases for various reasons. To the extent indicated the respondent's determination of a rate based on a longer life, is modified. The third issue involves respondent's determination of negligence penalties for 1942 and 1943, under section 293 of the Internal Revenue Code. On this issue petitioner has failed to establish to our satisfaction that he was not negligent in proper maintenance of regular books of account and/or in the preparation of his tax returns *28 for the years in question. We sustain the respondent's assertion of a five per cent negligence penalty on any deficiencies recomputed in accordance with this opinion. Decision will be entered under Rule 50.